UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**RECEIVED**

APR 1 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

ANTHONY E. RAMOS

        Petitioner,

vs.                                                      Civil Action No.: 06 1941 (RMU)

EXECUTIVE OFFICE OF IMMIGRATION
REVIEW and UNITED STATES
CITIZENSHIP AND IMMIGRATION
SERVICE BOARD OF IMMIGRATION
APPEALS

        Respondents.

_____

## PETITIONER'S FIRST SUPPLEMENT TO MOTION FOR MANDATORY INJUNCTION AND REQUEST FOR JUDICIAL NOTICE

COMES NOW the Petitioner, Anthony E. Ramos, pro se, and files this First Supplement to Motion for Mandatory Injunction, and states:

1. The Petitioner has filed a Motion for Mandatory Injunction, seeking relief from this Court concerning the publication of scandalous material on the Internet by the Respondents.

2. The Respondents, in posting a report of disciplinary proceedings, published the editorial type revised order written by the 'immigration judge' in this matter.

3. The posting contains almost no information concerning these proceedings.

4. The only place on the Internet where the question of the Petitioner's disbarment appears, is on the posting put there by the Respondents.

5. An independent committee in Washington, DC, investigating the facts can circumstance has recently made the following finding of fact:

> Notably, Florida Bar Counsel had offered to settle the disciplinary proceedings on the basis of the applicant agreeing to a disciplinary resignation in accordance with the Florida Bar Rules, without eligibility for reinstatement for a period of five years.
> The applicant had accepted that offer through his Florida attorney, who (together with Bar Counsel) had so represented to the referee.

6. This Court may take judicial notice of the two newspaper articles attached to this First Supplement. Both appeared recently in the Washington Post. In the first, the Attorney General finds himself apologizing for the damage done to the reputations of his own employees in firing them. In the second, the outrageous harm done to the reputation of the students in the Duke rape scandal case is laid squarely upon an out of control prosecutor. In both instances, it is clear that none of the victims has any fault in the matters for which they were charged.

7. In the instant case, the Petitioner has made a prima facie showing of behavior which is, perhaps, far more outrageous than that in the two instances just mentioned. In the instant case, there is a prima facie showing of government ethics lawyers acting unethically. Actual affirmative steps were taken by each of the attorneys in this matter to cause untoward and irreparable harm to the Petitioner's reputation. The harm is continuing, and has placed the Petitioner's ability to earn a living at great risk. The Respondents however, despite having sole control over the link to the Internet, have not updated the link, and in particular have shielded their own behavior by failing to post the evidence of their own actions on the link.

8. Finally, assuming arguendo and without any possibility that the Petitioner
could have or did enter into any immigration proceedings, the time period for
the sanction imposed has expired. As a result, no posting should appear on
this matter concerning the proceedings.


WHEREFORE, the Petitioner reiterates his request for an Order granting his
Motion for Mandatory Injunction.


RESPECTFULLY SUBMITTED,


Anthony E. Ramos, pro se
1805 Key Blvd.
Apt. 513
Arlington, VA
202-321-7969
tramos520@verizon.net

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the sixteenth day of April, 2007 the original and two
copies of the foregoing were filed with the clerk, and that two copies were mailed, via
U.S. mail to: Song E. Park, Esquire, U.S. Department of Justice, P.O. Box 878,
Washington, D.C. 20044; and to Robin M. Meriweather, Esquire, Assistant United States
Attorney, 555 Fourth Street, NW, Washington, DC 20530

Anthony E. Ramos

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANTHONY E. RAMOS

      Petitioner,

vs.                                                              Civil Action No.: 06 1941 (RMU)

EXECUTIVE OFFICE OF IMMIGRATION
REVIEW and UNITED STATES
CITIZENSHIP AND IMMIGRATION
SERVICE BOARD OF IMMIGRATION
APPEALS

      Respondents.

---

**PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF FIRST
SUPPLEMENT TO MOTION FOR MANDATORY INJUNCTION AND
REQUEST FOR JUDICIAL NOTICE**

I.

STATEMENT OF THE CASE AND OF THE FACTS

The Petitioner practiced solely as a multi-million dollar jury trial lawyer in

Florida for sixteen years. The Petitioner prefaces this memo with that fact, not to show

the extent of his success, but rather to make the statement that, during that entire period

of time, there was not a single occasion where any judge or adverse part sought to change

the rules by which both sides proceeded in court.

Unlike those sixteen years, however, and for the past twelve years, the Petitioner

has now been involved in actions where he has either been accused, or where he is

attempting to move forward with his career. In both instances, it has become clear to the

Petitioner that, when involved in such administrative proceedings, there is an almost blind deference paid to the lawyers for the committees by the presiding officer. In addition, the Petitioner has learned that, unlike normal everyday court proceedings, in those proceedings, the more steps the Petitioner took to fight for procedural due process rights, the more tenuous his chances of success became.

In this instance therefore, the Petitioner finds himself once again, now some ten years after a failed settlement on his disciplinary case in Florida, faced, again, with lawyers who can and do bend the rules. It is impossible for the Petitioner to prevail, so long as he shows, as he has, that individual lawyers have taken extra-judicial action against him. This Court should be aware that the last thing the Petitioner needed was more litigation about him, from anyone. He does not seek to take any action against the attorneys involved in this matter, and simply wishes to extricate himself from any further proceedings.

Having said that, and knowing full well that the Respondents will oppose his motion for mandatory injunction, the Petitioner, nevertheless, will proceed with the motion. The facts of the disciplinary proceedings are well known. For a period of years, the Petitioner's paralegal robbed the Petitioner's trust account. The Petitioner accepted full responsibility for his negligence in not maintaining his trust account, and paid back all victims with interest. The disbursement proceedings took from January, 1998 to September, 2001, because the paralegal's actions made it impossible to clearly locate all of the victims.

In October, 1997, the Florida Bar lawyers, the referee, and the Petitioner's lawyer entered into a settlement agreement for a five year suspension, based upon the theft of

funds by the paralegal and the Petitioner's obvious efforts at reimbursement. On the Friday before the Monday of the hearing to finalize the settlement, however, one of the Florida Bar lawyers, together with the Petitioner's attorney, without notice to the Petitioner, convinced the referee to hold a secret hearing, whereby the Petitioner's own attorney withdrew from the case. As a result, on the Monday of the hearing, the Petitioner had no attorney present on his case, and the Florida Bar attorney proceeded to try the case without the Petitioner or his attorney. Florida law prior to that event, at the time of that event, and subsequent to that event, makes mandatory that any proceedings must be abated in order to give a person the opportunity to secure new counsel. That law was ignored with respect to the Petitioner in the Florida proceedings. It would not be until the year 2005, while making application to another Bar, that the Petitioner would learn of the secret hearing. Extensive evidence was then provided to the admissions committee, with the ultimate finding of fact as set for in the First Supplement.

Despite the proffer of all of this evidence, the 'immigration judge' for the reasons set forth in Petitioner's main brief, disposed of the case without a hearing of any sort, and without any discovery of any sort, and therefore, without any actual evidence of any sort. After issuing the order of expulsion, and for reasons not yet known, the 'immigration judge' arose one day, and *sua sponte*, wrote the scandalous order from with this Petition is taken. The language of the order is on a par with the recent comments of Don Imus.

During the course of these proceedings, a business colleague alerted the Petitioner to the existence of the link on the Internet, and that discovery prompted the filing of the Motion for Mandatory Injunction. This Court may know that, during the entire sixteen year time period when the Petitioner served as a jury trial lawyer, he found no occasions

to ask a court to take judicial notice of a newspaper article. Given that these administrative proceedings always seem to turn on the 'attitude' of the accused, and given that the Petitioner, in fighting for his rights has suffered from that subjective 'attitude' factor, the Petitioner has asked this Court to take judicial notice of the horrific actions of government attorneys and of the consequences on the reputations of the victims. At the risk of being viewed as having a 'bad attitude' the Petitioner believes that the actions of the two attorneys involved in this matter are more outrageous than those of the attorneys in the two articles. In one instance, a government ethics attorney, clearly knowing that the agency which she represents had no standing in these proceedings, but knowing that her representations would be taken as truthful by the 'immigration judge,' intentionally entered into these proceedings, and remained in these proceedings to the end. In the other instance, a government ethics attorney clearly gained access to government printing paper, and fabricated an entire case against the Petitioner. Again, because of the overwhelming presumption that any statement made by government lawyers is correct, the 'immigration judge' took no action to verify the authenticity of the false documents.

## II.

## POINTS OF LAW

Rule 201 of the Federal Rules of Evidence allows for judicial notice.

8. C.F.R.§ 3.107 (a) limits the period of expulsion to one year.

III.

CONCLUSION

In these administrative type proceedings the more an accused pushes to protect procedural due process rights, the more likely the adverse consequence to the accused, even when the accused is correct on the law.

In these administrative type proceedings, government lawyers, especially if they may be identified, are given the benefit of a presumption of truth telling, so that 'judges' do not question the authenticity of any documents produced or the veracity of any statements made by those attorneys.

The actions of attorneys, as shown in the documents of which the Petitioner requests judicial review, show, however, unquestionably, that, in fact, government attorneys can and do engage in acts which are designed to, and do, cause serious, permanent and ongoing harm to the reputations of the accused.

In the instant case, the Petitioner has made a prima facie case showing, clearly, unethical actions by government ethics attorneys in achieving an expulsion of the Petitioner, despite the knowledge that the Petitioner had never entered into any immigration court. Thereafter, for reasons not known, an 'immigration judge' arose one day and created a scandalous and very damaging and untruthful order, not reciting the immigration proceedings, but rather the Florida Bar proceedings.

The Respondents, despite know of clear exculpatory evidence in favor of the Petitioner, and despite the complicity of Respondent's attorney, have refused to take corrective steps to remove the false information from the government Internet link, and further, have refused to post the correct information, concerning the acts of the attorneys,

and of the pendancy of these proceedings. Those same attorneys have refused to acknowledge that, by law, the period of expulsion, without assuming its legality, expired in January, 2006.

The continued presence of the information on the link is extremely damaging to the reputation of the Petitioner, and such damage is extensive, permanent on going, and the Petitioner has no other remedy at law.

As such, the Petitioner requests the entry of an Order directing the government to disconnect the link on this matter, pending final disposition of this matter, and subject to the continuing jurisdiction of this Court over any future such links.

RESPECTFULLY SUBMITTED,

Anthony E. Ramos, pro se
1805 Key Blvd,
Apt. 513
Arlington, VA
202-321-7969
tramos520@verizon.net

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the sixteenth day of April, 2007, the original and two copies of the foregoing were filed with the clerk, and that two copies were mailed, via U.S. mail to: Song E. Park, Esquire, U.S. Department of Justice, P.O. Box 878, Washington, D.C. 20044; and to Robin M. Meriweather, Esquire, Assistant United States Attorney, 555 Fourth Street, NW, Washington, DC 20530

Anthony E. Ramos

SUNDAY, APRIL 15, 2007   **B7**

## Alberto R. Gonzales

# Nothing Improper

My decision some months ago to privately seek the resignations of a small number of U.S. attorneys has erupted into a public firestorm. First and foremost, I appreciate the public service of these fine lawyers and dedicated professionals, each of whom served his or her full four-year term as U.S. attorney. I apologize to them, their families and the thousands of dedicated professionals at the Justice Department for my role in allowing this matter to spin into an undignified Washington spectacle.

What began as a well-intentioned management effort to identify where, among the 93 U.S. attorneys, changes in leadership might benefit the department, and therefore the American people, has become an unintended public controversy.

While I accept responsibility for my role in commissioning this management review process, I want to make some fundamental points abundantly clear.

I know that I did not — and would not — ask for the resignation of any U.S. attorney for an improper reason. Furthermore, I have no basis to believe that anyone involved in this process sought the removal of a U.S. attorney for an improper reason.

Given my convictions on this issue, I testified before Congress in January and will do so again on Tuesday. I have personally spoken with many members of Congress over the past several weeks to hear their concerns about this matter. Additionally, I have instructed all Justice Department officials to make themselves available for on-the-record interviews with lawmakers and hearings before Congress, and I have ordered the release of thousands of pages of internal documents.

All of these documents and public testimony indicate that the Justice Department did not seek the removal of any U.S. attorney to interfere with or improperly influence any case or investigation. Indeed, I am extremely proud of the department's strong record of vigorous prosecutions, particularly in the area of public corruption, where Republicans and Democrats alike have been held accountable for their crimes.

I have nevertheless asked the Justice Department's Office of Professional Responsibility to further investigate this matter. Working with the department's Office of Inspector General, these nonpartisan professionals will complete their own independent investigation so that Congress and the American people can be 100 percent assured of what I believe and what the investigation thus far has shown: that nothing improper occurred.

While I have never sought to deceive Congress or the American people, I also know that I created confusion with some of my recent statements about my role in this matter. To be clear: I directed my then-deputy chief of staff, Kyle Sampson, to initiate this process; fully knew that it was occurring; and approved the final recommendations. Sampson periodically updated me on the review. As I recall, his updates were brief, relatively few in number and focused primarily on the review process.

During those conversations, to my knowledge, I did not make decisions about who should or should not be asked to resign.

I am committed to explaining my role in this process and will do so Tuesday when I testify before Congress.

I am also committed to correcting any management missteps that occurred during this process. In recent weeks I have met with more than 70 U.S. attorneys around the country to hear their concerns and discuss ways to improve communication and coordination between their offices and the Justice Department.

These discussions have been frank, and good ideas are coming out, including ways to ensure that every U.S. attorney can know whether his or her performance is at the level expected by the president and the attorney general. Additionally, I have asked for recommendations on formal and informal steps that we can take to improve all forms of dialogue between the main Justice Department and U.S. attorneys nationwide.

I am also telling our 93 U.S. attorneys that I look forward to working with them to pursue the great goals of our department in the weeks and months to come. During the past two years, we have made great strides in securing our country from terrorism, protecting our neighborhoods from gangs and drugs, shielding our children from predators and pedophiles, and protecting the public trust by prosecuting public corruption. As I have stressed repeatedly to our U.S. attorneys and others within the department, recent events will not and must not deter us from our important mission.

In part because of my own experience, I know the real strength of America. It lies in our Constitution, our people and our collective unyielding commitment to equal opportunity, equal justice, common decency and fairness. With this same commitment in my mind, I very much look forward to answering Congress's questions about this matter on Tuesday.

# All Charges Dropped Against 3 at Duke

By Peter Whoriskey
and Sylvia Adcock
*Washington Post Staff Writers*

RALEIGH, N.C., April 11 — Rather than simply drop the remaining charges against three former Duke University lacrosse players, North Carolina Attorney General Roy Cooper turned the tables on the prosecutor Wednesday and, after castigating him as a "rogue" who acted out of "bravado," said he could face a criminal investigation for his pursuit of the sexual assault case.

"We believe that these cases were the result of a tragic rush to accuse and a failure to verify serious allegations," Cooper said. "There were many points in this case where caution would have served justice better than bravado."

A criminal investigation of Durham District Attorney Michael B. Nifong is a "possibility," he said, noting that the North Carolina bar is already investigating an ethics complaint against him. Nifong did not return calls to his office, but his lawyer, David Freedman, told ABC News that "he pushed the case as

See DUKE, A20, Col. 2

# Prosecutor Faulted as Charges In Duke Case Are Dropped

DUKE, *From A1*

long as he did because at that point he believed in this case."

The attorney general's announcement draws to a close a racially charged legal drama that opened with the three white players being vilified as privileged "hooligans" — Nifong's word — who had gang-raped a black stripper at an off-campus team party on March 13, 2006.

But after reviewing the case for 12 weeks and interviewing witnesses and the accuser, Cooper's team completely recast the scenario.

There was no credible evidence of an attack — there was no DNA evidence and no witnesses at the party who could corroborate the accuser's account, Cooper said. The accusation also was not consistent with time-stamped photographs and phone records, he said.

A written summary of the factual findings that investigators relied on to conclude that no attack occurred will be released next week. Cooper added that perjury charges against the accuser were considered but rejected, because she appears to believe in her uncorroborated and sometimes contradictory accounts of a sexual assault.

Hours after the announcement, David Evans, Collin Finnerty and Reade Seligmann, along with their families and many of their former teammates, gathered at a Raleigh hotel ballroom. Amid hugs, praise for the lawyers and declarations of relief that the more than year-long "nightmare" was over, the players and their attorneys excoriated members of the news media who had jumped to conclusions early on.

They also wondered aloud what must happen to those who are falsely accused but lack the means to hire a phalanx of lawyers and experts.

"It's been 395 days since this nightmare began, and finally the day has come for closure," said Evans, who attended Landon School in Bethesda. "It's painful to remember what we went through in those first days. Its just a testament to all of our character that we never lashed out. . . . To have people in the media relating you to Hitler and other terrible people from history when you have done nothing wrong — that is character to sit there and

take that."

He added: "I hope these allegations don't come to define me. I hope that the way I could be remembered is for sticking up for my name, my family and my team against impossible odds — the entire country against us."

Asked about whether the players would consider a legal action against Nifong, Evans attorney Joseph Cheshire said all options are on the table.

Legal experts say prosecutors cannot be sued for actions within the scope of their job but can be held liable for actions outside that scope.

At the hotel gathering, eventually a reporter asked about strippers being present at the party.

"We've lost a sense of proportionality here," said James P. Cooney III, a lawyer for Seligmann. "No one's proud of that party, and they've expressed regret for it." But to suggest that the party justifies these charges is ridiculous, he said.

Evans has graduated. Seligmann and Finnerty plan to return to college in the fall but not to Duke, their families said. The father of one of the two still in college said he would never let his son return to Durham County as long as Nifong is the district attorney.

Finnerty was convicted last year of a 2005 assault charge stemming from a street altercation in Georgetown. He was placed on six months' probation.

While the players, teammates and families bathed in a sense of relief, others in the community said they still harbor doubts about whether justice was done.

Irving Joyner, a law professor at North Carolina Central University who has been monitoring the case for the NAACP, said the black community will want to be satisfied with the reasons for the dismissal — especially since early days in the case, black leaders were concerned that a low-income black woman's word would not be taken against that of privileged white men.

Joyner added that he is "troubled and concerned by the carnival atmosphere being created here — that these three men are somehow coming home for a victory party."

As for the accuser, Cooper said, she still wants to proceed with the prosecution.

The accuser was originally depicted as a victim of race and class antagonisms, and candlelight vigils were held for her. But her lack of credibility helped sink the case.

DNA tests did not turn up matches with the players, and material from several other males were found in the accuser's vagina and on her underwear. Her accounts were marked by significant discrepancies, Cooper said, though he added that in some sense she may not have been lying.

"Our investigators who talked with her and the attorneys who talked with her over a period of time think that she may actually believe the many different stories that she has been telling," Cooper said. "In reviewing the whole history there are records under seal that I'm not going to talk about, but we believe it is in the best interests of justice not to bring charges."

Nifong's handling of the case began to come under increasing fire last fall, when defense attorneys complained that he had not turned over to them all the evidence required by law. At a Dec. 15 hearing, it was revealed that Nifong had withheld some of the exculpatory DNA evidence.

The prosecutor dropped rape charges against the three men Dec. 22, but charges of kidnapping and sexual offense remained.

The state bar first accused Nifong of making improper pretrial public statements, citing scores of media interviews just after the case broke, then levied more serious charges of withholding evidence from defense attorneys and making false statements to the judge, the lawyers and the bar. The allegations could lead to the loss of his license to practice law. Nifong is to appear before a three-member administrative panel on Friday to argue that the charges should be dismissed.

In making the announcement, Cooper talked about the damage an overreaching prosecutor can do to the justice system. He proposed a law that would enable the state Supreme Court to step in under certain circumstances to remove a district attorney from a case.

"In the rush to condemn, a community and the state lost the ability to see clearly," he said. "Today we need to learn from this and keep it from happening again to anybody."