UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

ANTHONY E. RAMOS

    Plaintiff,

vs.                                                                            Civil Action No.: 06 1941 (RMU)

EXECUTIVE OFFICE OF IMMIGRATION
REVIEW and UNITED STATES
CITIZENSHIP AND IMMIGRATION
SERVICE BOARD OF IMMIGRATION
APPEALS

    Defendant.

**RECEIVED**

MAY 29 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

### PETITIONER'S FOURTH REQUEST FOR JUDICIAL NOTICE ON THE MOTION FOR MANDATORY INJUNCTION

COMES NOW the Petitioner, Anthony E. Ramos, pro se, and files this Fourth Request for Judicial Notice on the Motion for Mandatory Injunction, and states:

1. Prior to filing this Request, and in conformance with Rule 7 of the Local Rules, Plaintiff contacted Defendants, concerning any objections to the filing. Defendants object to this Request.

2. The Petitioner requests judicial notice of the attached articles from the Washington Post.

3. These articles, in particular, point to what appears to be extensive irregularities in the hiring practices and procedures of the defendants.

4. As well, these and other attachments to previous requests appear to show a pattern or lawlessness among employees of the defendants.

5. The Plaintiff believes that these requests are, therefore, particularly timely, because all of these events were occurring at or about the time that the Plaintiff was complaining of the absence of any process at the administrative level.

6. In each instance, and to include the two attorneys in this matter, Ms. Barnes and Ms. McCarthy, there is evidence of doing things that were inconsistent with legal rules.

7. In the instant case, the Plaintiff immediately filed the equivalent of the Rule 12 (b) (6) motion to dismiss in the proceedings below. Under any normal judicial proceedings, an evidentiary process would have taken place, whereby discovery could have been obtained, and an evidentiary hearing could have occurred. Instead, at the urging of both Barnes and McCarthy, both of whom it is known were committing unethical acts, the 'immigration judge' readily accepted their statements, discounted the Plaintiff's proffer, and rushed the case to a disciplinary order before any discovery could take place.

8. Similarly at this stage of the proceedings, where in filing a 'motion for summary judgment' on an appeal, and urging that this Court treat a motion for mandatory injunction as requiring proof of the case without discovery and an evidentiary hearing, the defendant s continue with the same pattern of doing anything to keep their unethical acts from seeing the light of a courtroom.

## MEMORANDUM OF LAW

Rule 201 of the Federal Rules of Evidence allows for judicial notice.

                                  RESPECTFULLY SUBMITTED,

                                  Anthony E. Ramos, pro se
                                  1805 Key Blvd.
                                  Apt. 513
                                  Arlington, VA
                                  202-321-7969
                                  tramos520@verizon.net

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 26th day of May, 2007, the original and one copy of the foregoing was mailed via U.S. mail to: Greg Hughes, Clerk of Court, United States District Court, District of Columbia Circuit, 333 Constitution Ave. N.W., Washington, D.C. 20001, and that a copy was emailed and mailed, via U.S. mail to: Robin M. Meriweather, Esquire, Assistant United States Attorney, 555 Fourth Street, NW, Washington, DC 20530

                                  Anthony E. Ramos



"I do acknowledge that I may have gone too far in asking political questions of applicants for career positions," Monica Goodling testified.

# Goodling Says She 'Crossed the Line'

## Ex-Justice Aide Criticizes Gonzales While Admitting to Basing Hires on Politics

By DAN EGGEN and PAUL KANE
*Washington Post Staff Writers*

A former senior aide to Attorney General Alberto R. Gonzales leveled serious new accusations against him and his deputy yesterday, describing an "uncomfortable" attempt by Gonzales to discuss the firings of U.S. attorneys as Congress and the Justice Department were intensifying their investigations of the issue.

Monica M. Goodling, who resigned last month as Gonzales's senior counselor and White House liaison, also told the House Judiciary Committee yesterday that she "crossed the line" by using political criteria in hiring a wide array of career professionals at Justice, including looking up political donations by some applicants.

In a day-long hearing that afforded her immunity from prosecution, Goodling minimized her role in the controversial firings of nine U.S. attorneys last year and joined a long line of Justice officials who say they were not responsible for adding names to the lists of those to be dismissed.

But Goodling's appearance also opened broad new avenues of inquiry for congressional Democrats, who think Gonzales has presided over intensifying political meddling at the Justice Department and provided fresh evidence of the deepening rifts between current and former Justice officials.

■ The many faces of the Monica Problem. *Washington Sketch*, A2

See GOODLING, A4, Col. 3

WASH POST 05-29-07

ho have increasingly turned on ne another since the prosecutor firıgs.

Goodling, 33, alleged that Deputy ttorney General Paul J. McNulty as "not fully candid" with Conress about his knowledge of White [ouse involvement in the firings. IcNulty, who tendered his resignaon last week, disputed that.

Under intensive questioning from ep. Artur Davis (D-Ala.), Goodling lso described a mid-March meeting ith Gonzales that began as a disussion of her future at Justice but nded with talk about the U.S. atorneys' firings.

"Let me tell you what I can reıember," he said, according to her ccount.

"He laid out for me his general ecollection . . . of some of the procss" of the firings and then asked "if I ad any reaction to his iteration," oodling said.

She said the conversation made er "a little uncomfortable" because he knew that she, Gonzales and thers would be asked to testify bere Congress.

"Do you think, Ms. Goodling, the ttorney general was trying to shape our recollection?" Davis asked.

Goodling paused, then said: "No . . I just did not know if it was a conersation that we should be having, nd so I just — just didn't say anyhing."

She added that she thought Gonales was only "being kind."

Gonzales told the House Judiciay Committee earlier this month hat he had not discussed the details if the firings with other potential vitnesses, "in order to preserve the ntegrity" of ongoing investigations ıy Congress and by the Justice Deıartment.

The meeting occurred after the ustice Department's Office of Proessional Responsibility launched an nvestigation into the firings on March 14, officials said. Later that nonth, the OPR was joined by the lepartment's inspector general.

"The attorney general has never ıttempted to influence or shape the estimony or public statements of ıny witness in this matter, including vls. Goodling," spokesman Brian loehrkasse said. "The statements ıade by the attorney general during his meeting were intended only to omfort her in a very difficult period f her life."

Goodling alleged that McNulty rovided Congress with "incomılete or inaccurate" testimony on



Monica Goodling confers with one of her lawyers during the hearing before the House Judiciary Committee.

BY MARK WILSON — GETTY IMAGES

several points in February despite being briefed about the issues beforehand. She also alleged that McNulty barred her from attending a closed-door Senate briefing because he feared that her presence would cause lawmakers to question whether the White House was involved in the firings.

"Despite my and others' best effort, the deputy's public testimony was incomplete or inaccurate in a number of respects," Goodling said. "I believe the deputy was not fully candid about his knowledge of White House involvement in the replacement decision."

McNulty, who will leave Justice this summer, disputed the allegations in a statement: "I testified truthfully at the Feb. 6, 2007, hearing based on what I knew at that time. Ms. Goodling's characterization of my testimony is wrong and not supported by the extensive record of documents and testimony already provided to Congress."

McNulty and Principal Associate Deputy Attorney General William E. Moschella have told lawmakers they did not receive adequate information from Goodling, who participated in briefings before they each testified to Congress.

Goodling's testimony about hiring practices amounts to a dramatic public admission that she and other Justice aides routinely used potentially illegal criteria in deciding whom to hire as career prosecutors, immigration judges and those in other nonpolitical government jobs.

"I do acknowledge that I may have gone too far in asking political questions of applicants for career positions and may have taken inappropriate political considerations into account on some occasions," she testified. "I regret these mistakes."

Under questioning from Rep. Hank Johnson (D-Ga.), Goodling repeatedly declined to estimate how many times she had considered political affiliations in career hiring decisions. Johnson finally asked whether it was more or fewer than 50 cases.

"I don't think that I could have done it more than 50 times, but I don't know," she replied.

Goodling, a former opposition researcher for the Republican National Committee, revealed that prospective hires for the immigration courts, which are administered by Justice, were among those who may have been subjected to political litmus tests.

She said that D. Kyle Sampson, then Gonzales's chief of staff, had told her she did not have to abide by restrictions on weighing political affiliations in those positions. The department's Civil Division later raised objections and froze hiring for the immigration courts in December, she said.

Justice spokesman Dean Boyd said yesterday that reforms were implemented and hiring has resumed.

In addition to the inquiry into the prosecutor firings, the department's inspector general and professional responsibility offices have begun to investigate whether Goodling may have broken federal laws or internal rules by weighing political affiliations in career hiring decisions.

Goodling offered a few new details about some of the U.S. attorneys who were fired, saying that she had recommended removing Daniel Bogden of Nevada and Paul K. Charlton of Arizona in January 2006. They were included on a draft list at that time but were not passed on to the White House as candidates for firing until later in the year.

House Republicans stood steadfastly behind Goodling, even as she repeatedly apologized for weighing political affiliation.

"There not only is no evidence of wrongdoing, but there is no allegation of any wrongdoing on your part," Rep. Steve King (Iowa) told her.

*Staff writer Amy Goldstein and staff researcher Madonna Lebling contributed to this report.*

Case 1:06-cv-01941-RMU   Document 25   Filed 05/29/2007   Page 6 of 6

# Officials Say Justice Dept. Based Hires on Politics Before Goodling Tenure

By DAN EGGEN
*Washington Post Staff Writer*

The Justice Department considered political affiliation in screening applicants for immigration court judgeships for several years until hiring was frozen in December after objections from department lawyers, current and former officials said yesterday.

The disclosures mean that the Justice Department may have violated civil service laws, which prohibit political considerations in hiring, for as long as two years before the tenure of Monica M. Goodling, the former aide to Attorney General Alberto R. Gonzales who testified about the practice this week.

Goodling told the House Judiciary Committee on Wednesday that she "crossed the line" in considering political affiliation for several categories of career applicants at Justice, including immigration judges.

The attorney for D. Kyle Sampson, Gonzales's former chief of staff, said yesterday that Sampson and other officials also forwarded names of politically connected applicants for the immigration courts, based on legal advice that Sampson was given and on common historical practice in the department.

"Based on this understanding, Kyle Sampson and others in the department believed it appropriate to forward names of qualified candidates who enjoyed political support," Bradford A. Berenson, Sampson's attorney, said in a statement.

Sampson began working at Justice in late 2003, and officials said the practice probably began in early 2004. Goodling became Gonzales's counsel in October 2005, and his senior counselor and White House liaison in April 2006. The Justice Department said yesterday that its administrative immigration courts are covered by civil service laws that prohibit political considerations in hiring.

The department's hiring practices have come under scrutiny in the furor over the firings last year of nine U.S. attorneys. A Justice Department investigation of the dismissals has been expanded to include whether Goodling and other Gonzales aides improperly took politics into account in hiring for nonpolitical jobs.

Goodling testified that Sampson told her that the department's Office of Legal Counsel had concluded that immigration judges were not covered by civil service rules. The Justice Department said after her testimony that it had "located no record" of an OLC opinion that reached that conclusion.

Goodling's attorney, John M. Dowd, said in a statement yesterday that Goodling was referring in her testimony to the verbal advice from Sampson, not to any formal opinion from OLC.

Berenson said the legal debate over whether immigration judges are covered by civil service rules "was highly uncertain and legally complex."

The nation's 226 immigration judges are civil service employees appointed by the attorney general. Gonzales has appointed 26, while his predecessor, John D. Ashcroft, appointed 49, Justice officials said.

A number of the judges appointed over the past two years have strong Republican or Bush administration ties, including former senior Justice officials and a former GOP counsel on Capitol Hill, records show.

One judge appointed in 2005, Garry D. Malphrus, was associate director of the White House Domestic Policy Council from 2001 to 2004, records show. Another, appointed last year, Mark H. Metcalf, is a former Justice and Defense department lawyer who unsuccessfully ran as a GOP congressional candidate in Kentucky.

Officials said yesterday that the debate over immigration judges came to a head late last year when, in response to a lawsuit, department lawyers concluded that political considerations were improperly used in the selection process. Hiring was suspended from December until April, when a new merit-based personnel process was put in place, the department said.

Also yesterday, the House Judiciary panel announced that it would seek testimony from outgoing Deputy Attorney General Paul J. McNulty and a second round of testimony from William E. Moschella, a senior McNulty aide. Goodling alleged that McNulty was "not fully candid" with Congress about his knowledge of White House involvement in the prosecutor firings and other issues. McNulty, who is resigning in the summer, denied the allegations.