UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANTHONY E. RAMOS

      Petitioner,

vs.

Civil Action No.: 06 1941 (RMU)

EXECUTIVE OFFICE OF IMMIGRATION
REVIEW and UNITED STATES
CITIZENSHIP AND IMMIGRATION
SERVICE BOARD OF IMMIGRATION
APPEALS

      Respondents.

*Leave to file granted 6/13/08*

*Ricardo M. Urbina*

---

**PETITIONER'S NOTICE OF COMPLIANCE WITH MINUTE ORDER OF**

**APRIL 25, 2008,  MOTION  FOR LEAVE TO AMEND MOTION FOR**

**RECONSIDERATION, AND AMENDED MOTION FOR RECONSIDERATION**

COMES NOW the Petitioner, Anthony E. Ramos, pro se, and files this Notice of

Compliance with Minute Order of April 25, 2008, Motion for Leave to Amend Motion

for Reconsideration, and Amended Motion for Reconsideration, and states:

**STATEMENT OF COMPLIANCE WITH MINUTE ORDER OF APRIL 25,**

**2008, AND MOTION FOR LEAVE TO FILE AMENDED MOTION FOR**

**RECONSIDERATION**

# RECEIVED

JUN 0 9 2008

Clerk, U.S. District and
Bankruptcy Courts

## A.

## AS THE RESPONDENTS POINT OUT, THE JUDGMENT IN THIS MATTER IS REVERSIBLE BECAUSE THIS COURT ERRONEOUSLY CONCLUDED THAT THERE ARE 'IMMIGRATION COURTS' WITHIN THE DEPARTMENT OF HOMELAND SECURITY

As this filing will show, this matter has always been and remains a battle of jurisdiction.

The Respondent parties before this Court never had and have no jurisdiction to impose any discipline over the Petitioner.

As an initial point of compliance, the Petitioner hereby alerts this Court that the Respondents, in footnote 3 of their Opposition, (hereinafter footnote 3) (R. 63), flag to this Court that the following statement in this Court's Judgment, is factually and legally erroneous: "In addition to practicing law in Florida, the plaintiff (Petitioner) has also entered his appearance on behalf of clients before the immigration courts within DHS AR at 000037-43." (R. 60) (parenthesis supplied) This error is fatal to the judgment because it would only be if the Petitioner was a) practicing before b) and immigration court, that the Respondent parties before this Court would have any chance of acquiring jurisdiction over the Petitioner. The Court made a mistake which is, therefore, fatal to the Judgment.

The referenced documents, as the Respondents further admit in footnote 3 are, for these purposes, irrelevant pre-printed forms not prohibited by any regulation, not used to

2

'practice' anything, and not found anywhere in any 'immigration court.' The Petitioner could never have been in a court that never existed. Given that this is the first primary sentence in the Court's ruling, and clearly erroneous, the Judgment should be vacated.

In addition, footnote 3 is a clear departure from assertions of the Respondents in all of their previous filings, proving that there is no vicarious liability in this matter. The Respondents continue to attempt to re-write the regulation concerning vicarious liability, which would permit them to remain in this case. The regulations, however, clearly prohibit the imposition of vicarious liability in the absence of any proof. By a simple analogy to a case involving an allegedly negligent driver in an automobile case, the Respondent parties before this Court did not own the car that DHS alleged it was driving at the time of the incident. They cannot, therefore, sue the Petitioner. At footnote 3, the Respondent parties before this Court now concede, for the first time, that there was never any such proof of ownership. They had and have no business in this matter.

Both the tribunal below and this Court have gone to great pains to excuse the fraud committed by senior government ethics attorneys in this matter. In fact, there is a direct connection between the fraud and the allegation of vicarious liability The fraud is, therefore, inexcusable. Given that there is no vicarious liability without a hearing and proof, and especially as to the Respondent parties before this Court, therefore, the Petitioner could not, similarly, on the record, ever have been in any setting in which the Respondents operate. The Judgment is clearly erroneous, and should be vacated.

While this Court, therefore, may be required under the standard of review to grant great deference to the tribunal, it is not required to parrot a ruling which is clearly based on rejecting evidence which is exculpatory to the Petitioner. Were such the case, there

would be no concept or doctrine of judicial review. For example, if a trial court admitted evidence obtained in violation of a person's Miranda rights, this Court would not be constrained to rubber stamp that admission of evidence.

This Court's overarching eighteen month effort to impugn the professional and personal reputation of the Petitioner, together with what may only be characterized as a an extraordinary effort to exonerate the fraudulent acts of two senior government attorneys, Barnes and McCarthy, led to a blindness that caused the clear error which was pointed out by the Respondents. The dramatic change in circumstances brought by the other language contained in footnote 3 now makes clear that the Respondents were never proper parties to this matter.

The government attorneys who have represented the Respondents before this Court should be commended for finally uncovering the cover-up and acknowledging the fraud perpetrated upon the tribunal below, and attempted in this Court, by the senior ethics attorneys, Barnes and McCarthy. The Petitioner has been unable, thus far, to locate any case where any Court approved fraudulent proceedings that occurred in administrative proceedings below. This may be the first such rubber stamp, and the judgment, therefore, sets a precedent that opens the door to such fraud being committed by personnel employed by administrative agencies, free from the fear that any judicial review will act as a check on such fraudulent acts. In footnote 3, the attorneys, who represent the Respondents before this Court, and by extension, Barnes and McCarthy, are advising this Court that such a precedent would be going too far.

<u>**B.**</u>

## <u>8 C.F.R. §292.3 (c) (1), WHICH IS THE SOLE CONTROLLING LEGAL AUTHORITY WITH RESPECT TO THE PARTIES TO THIS MATTER, DOES NOT PROVIDE FOR VICARIOUS LIABILITY, THUS PROVIDING FURTHER REASON FOR THE GRANTING OF THE MOTION FOR RECONSIDERATION, ESPECIALLY IN THE LIGHT OF THE ADMISSIONS IN FOOTNOTE 3</u>

While ordinarily the presentation of legal authority is reserved for subsequent sections of these filings, because so many alleged 'authorities' have been presented by the Respondents, it is important for this Court to fix in its mind the actual jurisdictional language of the one that they rely on as parties before this Court. As further analysis will show, in a confused attempt to defend a non-party, DHS, the Respondents also tend to rely on other regulations as a convenient smoke screen to hide the true identity of the issues with respect to the parties to this matter.

The only issue, with respect to the parties, which the Respondents before this Court have noted throughout these proceedings, including again in footnote 1 of their Opposition, is their alleged jurisdiction over the Petitioner. They rely solely on the following regulation:

> A copy of the petition shall be forwarded to the Office of the General Counsel of EOIR, which may submit a written request to the Board that entry of any order immediately suspending a practitioner before the Service also apply to the practitioner's authority to practice before the Board or the Immigration Courts. 8 C.F.R. §292.3 (c) (1)

As the admissions they now make in footnote 3 show, however, no manner of rewriting this regulation, as the Respondents continue to do even in their last breath in the Opposition, can change this language. There is no language in this regulation, which the Respondents cite and rely on, which as they state, says that there is an automatic, vicarious liability on the part of any person charged with any disciplinary violation before DHS or any other State, local, Federal, administrative, or, according to their filings, any other place which somehow allows for the parties before this Court to impose reciprocal discipline upon the Petitioner. According to the Respondents before this Court, it's wide open, but in fact, it is not. In fact, the language of the regulation is clear. It says that EOIR "may submit a written request." At no place in this regulation does it say, for example:

    a) EOIR shall have the right to the entry of an order, or;

    b) EOIR, the Board and the Immigration Courts shall automatically be made a party to any action initiated by DHS, or;

    c) In all cases EOIR, the Board and Immigration Courts shall automatically be included in any disciplinary orders emanating from DHS, or;

    d) In any disciplinary case in any jurisdiction in America, be it State, Federal, administrative or otherwise, EOIR, the Board and Immigration Courts shall have the power to impose reciprocal discipline upon any person disciplined in those jurisdiction, notwithstanding the fact that the person never appeared before EOIR, the Board or Immigration Courts.

There is no vicarious liability without proof. There is no reciprocal discipline without proof that the accused was actually in the jurisdiction of the reciprocating authority. The parties to this matter, under the analogy of an automobile incident, must prove ownership of the vehicle before they can join the case against an allegedly negligent driver. In footnote 3, they admit that they never owned the car, and their argument that it matters not that they never owned the car is contrary to the language of the regulation upon which they rely.

The Judgment against the Petitioner should be vacated.

## C.

## STATEMENT OF THE CASE AND OF THE FACTS

On April 25, 2008, this Court entered a MINUTE ORDER (hereinafter the Order) granting Petitioner's Motion for Clarification. There is no numbering in the record for this Order.

The Order instructs the Petitioner to set forth the legal justification for his Motion For Reconsideration, within the parameters of Rule 60 (b) of the Federal Rules of Civil Procedure, for the vacating of the Judgment entered against him.

In compliance with said directive, the Petitioner states here that Rule 60 (b) (1) provides for relief from the Order when there is among other things, "surprise."

In further compliance with said directive, the Petitioner states here that Rule 60 (b) (2) provides for relief from the Order when there is "newly discovered evidence

which by due diligence could not have been discovered in time to move for a new trial under Rule 59 (b)."

In addition, and in further compliance, the Petitioner states that Rule 60 (b) (6) provides for relief from the Order "for any other reason justifying relief from the operation of the judgment."

The Order further instructs the Petitioner "to explain how these reasons differ from the arguments set forth in the plaintiff's (Petitioner's) motion for reconsideration filed on March 18, 2008." (parenthesis supplied) In summary manner, the Petitioner states here, for further explanation below, that his reasons differ in that, in the motion filed on March 18, 2008, the Petitioner argued that the passage of time and recent events provided legal justification under Rule 60 (b) (6). The Petitioner made known that his efforts to rehabilitate his law license with The Florida Bar were proceeding. Sufficient grounds exist to vacate the Judgment of March 7, 2008, or at a minimum, to abate the matter, so as to provide to the Petitioner reasonable time to provide evidence of such.

Rule 60 would provide legal justification for such abatement, in some cases, up to one year, in others, with no specific time limit. Rule 60 states: "The motion shall be made within a reasonable time and for reasons (1), (2) and (3), not more than one year after the judgment, order or proceeding was entered or taken.............This rule does not limit the power of the court to entertain an independent action to relieve a party from a judgment, order, or proceeding..." The arguments made in the motion of March 18, 2008, therefore, remain valid and fall squarely within the provisions of Rule 60.

By contrast, and in further compliance with the Order, on April 6, 2008, the clerk entered into the record the Petitioner's Motion for Summary Judgment and Motion to

Vacate Orders Declaring Petitioner's Pleadings as Moot, as well as Petitioner's Reply to Opposition of Respondents to Petitioner's Motion to Vacate and Abate. (R. 64) The evidence shown in those motions could not have been known to the Petitioner, and to this Court, until March 31, 2008. It was on that day that the Respondents before this Court filed their Opposition to the Petitioner's Motion for Reconsideration of March 18, 2008. (R. 63)

In their Opposition where, aside from the lengthy arguments made, and case law cited, the Respondents before this Court make the two key raw factual admissions finally conceding the lack of jurisdiction over the Petitioner in the proceedings below. These remarkable admissions against interest are contained, and therefore framed outside of the actual Opposition text, placed instead in footnotes 1 and 3 in the Opposition. (R. 63) Footnote 3 is not a random statement, but is rather a multi-part admission against interest, made for the first time in the now nearly four year history of these proceedings, by the Respondents before this Court.

Given the disclosure made in footnotes 1 and 3 of the Respondents' Opposition, therefore, the Petitioner, on April 6, 2008, immediately filed a second Motion to Vacate the order entered in this matter, on March 7, 2008. (R. 64) The second motion to vacate was filed contemporaneously with Petitioner's Motion for Summary Judgment. This Court, in a MINUTE ORDER entered on April 14, 2008, ruled that the motion for summary judgment was procedurally improper, but did not address the question of the Petitioner's second motion to vacate. There is some question as to the correctness of the Court's ruling on the motion for summary judgment, because Rule 56 of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be filed by

the claimant 'at any time.' The Petitioner then filed a Motion for Clarification, which is the subject of the MINUTE ORDER being complied with herein. (R. 66)

In further compliance, therefore, with the Order, the Petitioner states here, to be further explained below, that he was surprised that, after nearly four years into these proceedings, the Respondents before this Court waited until after this Court entered the judgment of March 7, 2008, to state on the record that the Petitioner was never before the Respondents before this Court. This factual reason provides the legal justification under Rule 60 (b) (1), for this Court to consider the Petitioner's Amended Motion for Reconsideration.

Secondly, under the provisions of Rule 60 (b) (2), this is clearly newly discovered evidence, which could not have been discovered prior to the time when the Petitioner filed his first motion to vacate and/or abate on March 18, 2008. In fact, as the explanation below will show, despite the direct evidence to the contrary, the Respondents before this Court, from the time which was prior to the filing of the proceedings below, through the proceedings below, and up to the filing of the Opposition on March 31, 2008, knew and know that, in fact, the Petitioner had never appeared before any of the parties before this Court. Their arguments to this Court were always twofold. First, that the 'tribunal' below considered and rejected the evidence. And secondly, that the regulations provided for vicarious liability, arguing that it never mattered that the Petitioner had never appeared before any of the parties to the instant proceedings. Under this theory, any attempt by a low level administrative agency to impose discipline on any person would suddenly blossom into a right of every other agency and Court in the land magically obtaining jurisdiction in the matter for purposes of reciprocal discipline. A new theory never known

10

in the history of American jurisprudence. Despite this direct knowledge that the Petitioner never appeared before any of the parties before this Court, however, throughout the proceedings below and up to March 31, 2008 in these proceedings, the Respondents deliberately kept from the tribunal below, and this Court, the admission against interest found in footnote 3. After having exhausted all efforts to have the Respondents before this Court admit that the Petitioner was never before them, the Petitioner could not have discovered the admission in footnote 3 prior to the filing of his motion on March 18, 2008. Every single attempt to make this knowledge a part of the record below was successfully thwarted by Barnes, McCarthy and in fact, in their eloquent Opposition to the Petitioner's Motion to Expand the Record, by the Respondent parties before this Court. It only finally came out in footnote 3.

Third, given now the long sought after admission against interest by the Respondents before this Court, made after this Court ruled against the Petitioner, under Rule 60 (b) (6), reasons of procedural and substantive due process exists so as to cause this Court to vacate the judgment in this matter. The Respondent parties before this Court have known, from a time which is prior to filing the case below that EOIR has a letter stating that the Petitioner had never appeared before it. They knew that the allegation of 111 appearances by the Petitioner, made by DHS, by McCarthy, was false. And, they knew that the documents created for a fake case of Antonio and Sonia Ferriera, were counterfeit. It appears that the Petitioner's ongoing evidentiary presentation of these devastating documents may have finally led the Respondents before this Court to advise the Court of the absence of jurisdiction from the outset. Their disclosure to the Court is made in footnote 3. The Respondent parties before this Court make their final smoke and

mirrors argument in the body of their Opposition that, somehow, by magic, the Petitioner is automatically vicariously liable to them, but their recitation of facts in footnote 3 blows the smoke from the reality.

In further compliance with the Order, the Petitioner states here that, because this Court never ruled on the Petitioner's motion for leave to electronically file documents, he is unable to provide PIN cites and parentheticals. (R. 18) The Petitioner apologizes to the Court for what must appear as a somewhat technologically outdated manner of presentation of this document.

In further compliance with the Order, the Petitioner states here that this Notice, the Motion for Leave to Amend the Motion for Reconsideration, and the Amended Motion for Reconsideration, complies with the Federal Rules of Civil Procedure, the Local Civil Rules and the Court's Standing Order.

## PETITIONER'S  AMENDED MOTION  MOTION FOR RECONSIDERATION

## I.

## STATEMENT OF COMPLIANCE WITH LOCAL RULE 7 (m)

Pursuant to Local Rule 7 (m) and Federal Rule of Civil Procedure 26, the Petitioner conferred with defense counsel prior to filing this motion and defense counsel object to this Motion.

## II.

## THE PERSONS AND THE PARTIES IN THIS MATTER

Because of the highly charged nature of the language used against the Petitioner in the *ex parte* order below, (R. 1) together with the equally highly charged language used against the Petitioner beginning with the opening sentence of this Court's Order of March 7, 2008, (R. 60), the Petitioner believes it necessary to state, again, his position with respect to the persons and the parties in this matter. In that manner, the Petitioner hopes, that in any further Orders, this Court may avoid any such further unwarranted and disparaging comments, especially given the admissions against interest now made by the Respondent parties before this Court.

The Petitioner here advises the Court that he makes the following statements only with the greatest sense of hesitation. If at all possible, the Petitioner would like to avoid any reprisals by the Court over these statements.

The record will show that, for sixteen years, the Petitioner served solely as a jury trial lawyer in the courts in Florida. He was an ambulance chaser, albeit a very good one. Since the onset of these proceedings, therefore, he has viewed the parties and persons in this matter as just that, parties and persons. He has made no personal comments against any of the adverse persons or parties. In this sense, in his comments made and to be made concerning Barnes and McCarthy, he makes them because, as for example, he would make them against a party who broadsided his client in an automobile accident. They are the persons who can be identified directly in this matter. The Petitioner also believes it necessary to identify Barnes and McCarthy so that this Court, and the opposing counsel,

13

do not come under the impression that the Petitioner is referring to anyone else in these proceedings. Barnes and McCarthy just happen to be the persons who the evidence shows are responsible for the fraud which the Petitioner has proven, took place. They have to be named and their actions have to be proven with specificity. Other than this, the Petitioner has no interest or any other comment concerning Barnes and McCarthy.

With respect to the attorneys who have handled this matter before this Court, they have shown to the Petitioner nothing but an absolute civility which, in point of fact, he has not enjoyed in his Florida proceedings. He is very grateful to those attorneys for the courtesies and civility shown to him.

For himself, the Petitioner reiterates that it is regrettable that this Court allowed itself to be lured into using the same language as used in the *ex parte* Order below. A 'Board Member' below cherry-picked an old Report of Referee, in order to mask the fraud of Barnes and McCarthy. The Petitioner, meanwhile, aside from a stellar career as a jury trial lawyer, adopted two foster kids, broke down the barriers that prohibited the appointment of a Hispanic or Latino judge in Palm Beach County, was a founding 'Builder' of the Kiwanis of the Palm Beach Hispanics, the founding president of the Hispanic Bar Association of Palm Beach County, a major fundraiser for the Boy Scout program, and raised all of the money for all of the boys and supervising adults, and travelled on the Philmont Scout Ranch trek in the year, 2001, among other things. And, even after his erroneous disbarment in December, 1997, the Petitioner and for three years, with the referee and Bar counsel, located every claimant and paid every claimant with interest, after his paralegal had embezzled funds from his trust account for several years.

14

At present, the Petitioner is involved in a major effort to reclaim his law license. The referee in the case has provided deposition testimony asking for the Petitioner's readmission, and admitting that he was misled when Bar counsel represented to him, in a hearing for which no notice was provided, that he was misled into thinking that the Petitioner had fled from Florida with no intention of paying the claimants. The circumstances of the Petitioner's life, therefore, all of which had been made know to this Court prior to the entry of the judgment, militated against this Court parroting the uncalled for language used below.

The Petitioner, after so many years in the courthouse, is a veteran of courthouse and courtroom politics. In today's society, with the advancement of minorities in court and on the bench, there is a hyper effort to avoid the appearance of favoritism and patronage. In this case, for example, with two women, Barnes and McCarthy as the persons responsible, the U.S. Attorney immediately appointed a female as part of the trial team. Later, wanting to avoid the appearance of no Hispanics or Latinos on the trial team, the U.S. Attorney appointed a Latino to the trial team. The clerk, sensing that the Petitioner's Hispanic name would lead him to claim discrimination by the court, appointed a Hispanic judge to this matter. So that, it can be said that, in the politics of lawsuits, all of those bases have been covered.

The Petitioner never sought any special treatment from any court. It is true that the representation of minorities and women in the courts has an important social and political function. In large part, it prevents the pernicious atmosphere and comments that prevailed in courts in years gone by, and acts as an extra consideration when considering administration of the courts. There are no more open insults around the water cooler

about women or persons of different racial, ethnic or gender backgrounds. No person, minority or otherwise, however, should think that simply because a member of their social group is on the bench, some special consideration will be given. At the same time, however, judges on the bench need not go overboard to prove that they are not being lenient with members of their own ethnic, racial or gender group. It is simply not necessary to prove that a court can parrot an illegal ruling below in order to avoid some sense of being lenient towards any person or group. To the contrary, any court, but in particular, any court which is a member of such a group, should make an extra effort to be neutral and dispassionate in those circumstances. For generations in this country, it was easy for courts to write disparaging comments about women, minorities, and members of different gender groups, but those comments were being written by majority judges against members of those groups. Courts who are members of those groups, however, need not parrot that bygone era, and should consider cases, and write opinions in a manner which is limited to the evidence presented in the case.

Starting with a level playing field, therefore, let us review this matter in a dispassionate manner, from the standpoint of the evidence in the record.

### III.

### STATEMENT OF THE CASE

The MINUTE ORDER of April 25, 2008, authorizes the Petitioner to file the instant

Motion for Motion for Reconsideration. The Petitioner re-adopts and re-alleges all prior

allegations contained in his Motion for Reconsideration.

### IV.

### STATEMENT OF THE FACTS

### A.

### FOOTNOTE 3 REQUIRES THAT THE ORDER OF MARCH 7, 2008 BE
### VACATED AND THAT JUDGMENT FOR THE PETITIONER BE ENTERED

In addition to the reversible factual and legal error found in the Judgment,

footnote 3, for the first time, acknowledges the fraud which was committed on the

tribunal below. In addition, with the disclosures contained therein, the said footnote, for

the first time in these proceedings, admits that, in fact, there was never any jurisdiction

over the Petitioner by any of parties before this Court.

Footnote 3 is no random footnote, instead being comprised of several distinct

parts which give explanation to the fraud which was committed on the tribunal below by

17

Barnes and McCarthy, and attempted in these proceedings, until it was authored. The first part is dispositive of all the Respondent parties before this Court. It states, clearly: "Although the Plaintiff (Petitioner) did not practice before the immigration courts..." When read *in pari material* with footnote 1 of the Opposition (R. 63), it is clear that there are now no facts by which this Court could conclude that any of the parties before this Court exerted any jurisdiction over the Petitioner at any time, ever. The language of footnote 1 reads, in part: "The petition for review that initiated this action names only the Department of Justice, Board of Immigration Appeals, and the Executive Office of Immigration Review as defendants, and those are the only three defendants (Respondents) on this Court's docket sheet." (parenthesis supplied)  No parties before this Court, therefore, by the admission of those parties, ever had jurisdiction over the Petitioner, and judgment may now, finally, be entered for the Petitioner.

The second part of footnote 3 states: "... and had not practiced before EOIR as of January 17, 2003..." This date is significant. It preceded the filing of the matter below by McCarthy. It is the date on the Barnes letter to The Florida Bar, advising that the Petitioner had never practiced before EOIR. The Petitioner discovered the letter through a Freedom of Information Act request (hereinafter FOIA). The date is significant because it was after this date that Barnes joined in the action below, deliberately omitting that fact so that the tribunal below never knew about it. Barnes knew that the Petitioner had never been before EOIR, the Board or any immigration courts. As the further review of documents below will show, the parties before this Court continued in the attempt to shield Barnes from responsibility for her actions, until this statement was made in footnote 3.

The third part of footnote 3 dispels any notion that any forms G-28 have any relevancy in this matter. This part provides: "…the appearance forms indicate that he did appear before <u>DHS</u>." With this quotation, the parties before this Court, for the first time, omit the use of the word 'practice' as it relates to liability in this matter. In addition, this section is another admission that, without the Petitioner making any comment as to DHS, the Petitioner was ever in any manner in any proceedings before any party before this Court. By this further admission of the Respondents before this Court, judgment may be entered for the Petitioner. For example, the Order appealed from clearly states that the simple act of signing a form G-28 constitutes the 'practice' of immigration law. (R. 1) The admission in footnote 3, clearly states that, in fact, filing a form G-28 with DHS is just that, an appearance. The Respondents before this Court, at this stage of the proceedings, acknowledge this because, in fact, 8 C.F.R. §§ 1.1 (k) states that 'practice' by 'preparation' of a form "does not include the lawful functions of a notary public or service consisting solely of assistance in the completion of blank spaces on printed Service forms…" For that reason, the language of footnote 3 omits the charge that the Petitioner was 'practicing.' The form G-28 is an inconsequential pre-printed form. A piece of paper with no value unless used in the context of actually filing substantive documents. This is an admission against interest made for the first time in these proceedings, and is further grounds to vacate the  Order of March 7, 2008 and enter judgment for the Petitioner.

As importantly, the Respondents, by this section, admit that their theory of the alleged vicarious liability of the Petitioner has no factual or legal basis. By admitting that the Petitioner was not 'practicing' the Respondents are stating to this court that, under

any set of factual circumstances, there is no liability on the part of the Petitioner. Even if

he were 'practicing' before DHS, however, the argument of the Respondents that they

can somehow tack onto the DHS case is false. With the continuing analogy of a simple

automobile incident, as indicated above, the Respondents would claim to be the owners

of the vehicle that was being driven by DHS at the time the Petitioner allegedly ran a red

light and slammed into their vehicle. The Petitioner, however, at the time of the incident,

was nowhere near the intersection. It's true, he had gone through that intersection earlier

in the day. At the time of the incident, however, he was already home watching the

evening news. More importantly, the Respondents did not own the vehicle, so that, even

if he had been driving the offending vehicle, the Petitioner is not vicariously liable to

them.

  The Respondents before this Court, therefore, continue to cloud the issues, mixing

in their defense of a non-party, DHS, with their notion of vicarious liability. The hazard

of defending a non-party, however, caused their logic to fall apart, and led to the

admissions in footnote 3. For, if the Petitioner now is not 'practicing' before DHS, then

too he could never have been 'practicing' before the parties to this matter, assuming the

Court would allow the Respondents to re-write the regulation. But, even if the Petitioner

were, 'practicing' before DHS, a position to which the Petitioner would never concede,

he was not, as the Respondent parties before this Court now admit in footnote 3, ever

before them. The parties before this Court never needed to defend DHS. They needed to

prove that the Petitioner practiced before them. They reject that in footnote 3. It was

never fact.

8 C.F.R. §292.3 (c) (1), therefore, required the filing of the request, the opportunity for the Petitioner to file a reply below, and an evidentiary hearing on the issue. Barnes committed a fraud on the tribunal because, if she had disclosed the contents of her letter to the tribunal, her request to join the action would have been denied. The Petitioner, at the time of the Barnes fraud, could not have known of her letter. He found it later through a FOIA request. Barnes' fraud is not excusable. To the contrary, it is central to the manner in which EOIR, the Board and immigration courts surreptitiously entered into this matter. It was a direct fraud upon the tribunal. It had all the elements of fraud upon a tribunal. Her motion to join was a false statement by omission. She knew it was false at the time she made it. The tribunal relied on her false statement. And, the reliance was to the detriment of the Petitioner, because he was disciplined below as respects the parties before this Court, and by this Court, which entered a judgment against him as to those parties. The taint made it all the way to this Court. It is as if the Court rubber stamped a confession made in violation of a Miranda right. That is not the function of this Court.

In footnote 3, in fact, the Respondents before this Court, aware that by conceding that the Petitioner was not 'practicing' at DHS, there would be no need to reach the issue of Barnes' fraud, hope to continue to shield her actions. Her actions, however, as indicated, in a direct line, led to the sanction imposed by the tribunal below, and by this Court in favor of the Respondent parties before this Court. Because there is a direct line of both the Barnes and McCarthy fraud leading directly to the adverse results against the Petitioner, the detailed review of the filings below will prove how those actions would

21

break any chain of vicarious liability. Footnote 3 breaks any chain of liability on the part of the Petitioner.

The fourth part of footnote 3, therefore, provides the final break by the Respondents before this Court with all of the previous filings both below and in these proceedings. This part provides: "Those DHS appearances (not practicing) involved proceedings before USCIS (a DHS component), which are not immigration court proceedings." (first parenthesis only added)  This break with the past by the Respondents was not only a surprise, but is a wholly new piece of evidence, an admission against interest, not seen anywhere in any previous filings. This language makes clear several issues. First, since the Petitioner was never in the courts of any of the parties before this Court, he has no liability to these parties, and this Court may reverse its previous Order and enter judgment in favor of the Petitioner. The Respondents are all but saying: 'Judge, Mr. Ramos was never before us.'

Secondly, even assuming their wild theory of vicarious liability, the Respondents before this Court are saying that, whatever happened at DHS, or USCIS, it did not constitute court proceedings. If whatever happened did not constitute court proceedings, the Petitioner could not have been 'practicing.' If he was no 'practicing' anywhere, he cannot be disciplined. Having backed away completely from any notion that the Petitioner was 'practicing' anywhere, the Respondents before this Court are alerting this Court  that its Order may be vacated and an Order entered in favor of the Petitioner. Filing pre-printed forms before a low level administrative agency is not 'practicing' anything.

Part five of footnote 3 provides a startling sense of surprise in these proceedings. It is notable for the candor now being exhibited, post-Judgment, by the Respondents before this Court, constitutes another admission against interest, and because it was not known until it was made, the Petitioner could not have known of it. As indicated at the outset of this filing, this sentence alerts this Court that, in fact, the language of this Court's own Order is factually and legally incorrect, and therefore, reversible.. This final sentence of footnote 3 states: "**But see** Mem. Op. at 2 suggesting that Plaintiff (Petitioner) appeared before immigration courts." (parenthesis supplied)  As with the entire contents of footnote 3, this is no random comment being made by the Respondents before this Court. In fact, the Respondents are pointing out to the Court a mistake of fact and law in the Court's own Judgment. There simply are no 'immigration courts' in DHS. Were there to be such, the Respondents before this Court could have attempted to continue to stretch their wild theory of vicarious liability, but by admitting that no such courts exist, they are admitting that, even assuming a pre-printed form G-28 may have some validity, it is a useless piece of paper because it was never used in any immigration court proceedings, and because it is a pre-printed form, and because no substantive work was ever submitted by the Petitioner in any immigration proceedings. Here, therefore, the Respondents before this Court are signaling to this Court that this Court's own conclusions of both fact and law are erroneous and reversible.

The Respondents before this Court are thus, finally, stating to this Court what has been known all along, but kept from this Court. There simply is no theory, and there are no facts under which the Petitioner ever came under the jurisdiction of any entity, whether a party or not to these proceedings, having anything to do with immigration. The

23

Petitioner was never there. For our purposes, however, it is sufficient to state, again, that the Respondent parties before this Court now admit that they never had jurisdiction over the Petitioner.

This Court is not the parrot of the Respondents before this Court or of any non-parties. The Respondents before this Court have now admitted, at the very end of these proceedings, what has been known by them since the outset. In order to show the dramatic difference between the admissions in footnote 3, when compared with what went on before, the Petitioner will review the pertinent filings from the proceedings below, as well as from the proceedings before this Court.

As the Petitioner has proven, and will show below, McCarthy falsely alleged that the Petitioner filed 111 forms G-28 with USCIS, which is not a party to this action. McCarthy attached 7 pre-printed change of address forms which the Petitioner used in cases where an attorney was representing clients, to support her allegation that the Petitioner filed the 111 forms G-28. Throughout these proceedings, McCarthy, despite the serious allegations against her of fraud, has never produced the alleged 111 forms G-28. The Respondents before this Court have argued that McCarthy and in fact them, need not produce them, thus admitting to the fraud upon the Court. What remains unclear, is why the Respondents before this Court, and in effect, this Court, went to such extraordinary measures to defend McCarthy, because, as the Respondents parties to this action now admit, the only question as to them, *vel non*, is whether the Petitioner was ever before them. He was not.

**B.**

## FOOTNOTE 3 TRACES THE BARNES FRAUD DIRECTLY TO THE POINT WHERE EOIR ENTERED THE PROCEEDINGS BELOW

This Court has approved the Barnes fraud by arguing that, because the 'tribunal' below considered her letter and rejected it, this Court must rubber stamp that finding. This is akin to saying that even though a suspect was not read his Miranda rights below, this Court may still consider evidence that should have been suppressed in rubber stamping the trial Court's rulings. No such result could occur under those circumstances, and no such result should occur here. No standard of review requires such an outcome.

Footnote 3, therefore differs from every other presentation made in this matter in that, for the first time, it rejects Barnes' argument. It is not only the Petitioner who has proven the fraud, but now, essentially, Barnes' own attorneys. In this regard, at this stage of the proceedings, it is proper to recap just how the Barnes letter surfaced.

The date shown by the Respondents before this Court, in footnote 3, January 17, 2003, is exactly the date on the Barnes letter, telling The Florida Bar, that the Petitioner's name was nowhere to be found anywhere at immigration. (R. 000817) Unfortunately, it fell to the Respondents before this Court to make this statement more than five years later, in footnote 3.

The circumstances of the discovery of the letter, and the Barnes fraud, bear repeating. With lightning speed, the 'tribunal' below expelled the Petitioner from whatever tribunals exist below. In other words, all attempts by the Petitioner at discovery,

and every attempt to have a simple evidentiary hearing, were precluded. The Petitioner,
knowing that he had never done anything in 'immigration' then filed a (FOIA) request.
As part of the response to the FOIA request, the Barnes letter appeared. It took quite
some time to get the document, and it was the Petitioner, through counsel, who finally
made it a part of the record in April, 2006. (AR. 000815) Barnes had almost pulled it off.
Barnes had managed to continue the fraud for more than three years.

As such, when McCarthy filed this action below, on October 21, 2004, (AR.
000204), Barnes was already aware that the Petitioner had never practiced before EOIR,
the Board or any immigration courts.  The Petitioner was never on the Roster. 8 C.F.R. §
1292.2 (e)  This fact did not deter Barnes, because she filed both a motion to broaden
(AR. 000140) and a motion to join (AR. 000142). In the motion to broaden, Barnes
alleges only that "…the Executive Office for Immigration Review moves to join in this
action and petitions the Board to broaden the scope of any immediate suspension so that
it also applies to the practitioner's authority to practice before the Executive Office for
Immigration Review (i.e. Board and Immigration Courts)." (AR. 000141) In her motion
to join, Barnes alleges only that "…the Executive Office for Immigration Review
respectfully requests that any discipline imposed that restricts the authority of Anthony E.
Ramos to practice before the Department of Homeland Security also apply to
respondent's (Ramos') authority to practice before the Executive Office of Immigration
Review (i.e. Board and Immigration Courts). (AR. 000143) (first parenthesis added)

Barnes, however, cited no authority for her entry into this matter, and as is known,
deliberately kept secret from the tribunal her letter of January 17, 2003. She kept secret
from the tribunal that, in fact, there is no vicarious liability in this matter. As shown

26

above, 8 C.F.R. §292.3 (c) (1), does not provide for automatic entry into any case. The request must be made and proven. Barnes knew that she could not succeed in her motion to join, so she omitted the regulatory language and the facts of her letter.

It has fallen to current counsel, therefore, who, in footnote 3, finally exposed the Barnes fraud. They now admit, on behalf of EOIR, the Board and the immigration courts, and by extension Barnes, that the Petitioner was never before EOIR, the Board or any immigration courts. Such an admission against interest, coming now at the very end of these proceedings surely qualifies under the language of Rule 60. It directly contradicts the position taken by Barnes in the proceedings below, to the detriment of the Petitioner here. It shows clear fraud and clear error on the record below. It shows that even, as this Court has stated, if the 'tribunal' below considered and rejected this evidence, such rejection was categorically incorrect. By their own writing, the Respondents before this Court have rejected the Barnes fraud which she committed on behalf of the Respondents before this Court. Only were this Court the parrot of the 'judge' below, could such fraud be approved.

## C.

## FOOTNOTE 3 BY CONCEDING  THAT THE PETITIONER WAS NEVER 'PRACTICING' IN 'IMMIGRATION COURTS,' PROVES THAT THE COUNTERFEIT McCARTHY DOCUMENTS WERE USED TO DIRECTLY COMMIT A FRAUD UPON THE TRIBUNAL

Again here, careful analysis shows the pains to which the parties to this matter unnecessarily went to protect the McCarthy counterfeiting operation. These two issues so overwhelmed the interest of the Respondent parties before this Court and of this Court, that they obscured the actual issue in this case. The only issue in this case is whether the Petitioner was ever before the Respondent parties which are before this Court. The answer to that has always been 'no.' The regulation requires that he have been. The Respondents, however, instead of conceding this simple point many years ago, waited until the published footnote 3 to acknowledge this simple fact. The fog has been lifted on the McCarthy issue. Did she counterfeit documents? Yes. Did she use them to commit a direct fraud upon the tribunal, which Barnes then used to commit a further fraud upon the tribunal? Yes. Did the fraud directly lead to the imposition of the sanction against the Petitioner? Yes.

The Petitioner here reiterates his analogy that, just because a judge below allowed in evidence that was obtained in the absence of an accused being given Miranda rights, there is no cause for this Court to rubber stamp that obvious violation of a constitutional right.

This Court will recall, and may also review, the language of footnote 3. Any reference to 'practicing' is in the context of the Respondents before this Court advising this Court that the Petitioner was not practicing. Any references to filing an 'appearance' as somehow being 'practicing' are also rejected. As indicated above, the regulations do not make an appearance at any level, but especially where, as here, at the level of filling out preprinted forms, 'practicing.' Again, the language of the Respondents before this Court in footnote 3 is very specific and has never been disclosed to this Court and was

28

never disclosed to the tribunal below. To the contrary, all of McCarthy's filings allege
that the Petitioner was 'practicing."

Since there is no vicarious liability in this case, because the parties before this
Court now admit that the Petitioner was never before them, the only rotten thread by
which they cling to would be to show that, this notwithstanding, this Court should
conclude that the Petitioner was 'practicing' at DHS. The Respondent parties before this
Court, however, even cut that thread, because they know that 8 C.F.R. §§ 1.1 (k) requires
doing something substantive, something other than filling out a preprinted form. Since
the Respondents now stipulate, in footnote 1 of their Opposition, that DHS is not a party
to these proceedings, however, this Court need not have even have reached the erroneous
factual and legal conclusion found in the Judgment. By highlighting their defense of
Barnes, McCarthy and DHS, all non-parties before this Court, the Respondents before
this Court actually proved how the fraud directly led to the erroneous rulings below and
here.

It is important, however, to illustrate the difference between the reality of the facts
and law as the Respondents point out in footnote 3, with McCarthy's fraudulent actions
below. The issues of the McCarthy counterfeiting and the false allegations of the 111 G-
28s have already been pointed out to this Court in extensive detail. As importantly, are
the other McCarthy allegations, used to mislead the tribunal below.

On October 21, 2004, McCarthy filed, on behalf of U.S. Citizenship and

Immigration Services, Department of Homeland Security, a Petition for Immediate

Suspension. (AR. 000145)  At the top of this pleading appears the following:

UNITED STATES DEPARTMENT OF JUSTICE

EXECUTIVE OFFICE FOR IMMGRATION REVIEW

BOARD OF IMMIGRATION APPEALS

McCarthy, however, does not name those entities as parties. Instead, she refers

only to U.S. Citizenship and Immigration Services, Department of Homeland Security.

With the exception of reciting the fact of the Petitioner's disciplinary proceedings in

Florida, McCarthy makes no factual allegation concerning the Petitioner having any

relationship with U.S. Citizenship and Immigration Services, Department of Homeland

Security. The Petition requests relief only for U.S. Citizenship and Immigration Services,

Department of Homeland Security.

On the same day, McCarthy filed another pleading on behalf of the same party,

with the same caption at the top, entitled, NOTICE OF INTENT TO DISCIPLINE. (AR.

000204)  Here again, with the exception of reciting the Petitioner's disciplinary result in

Florida, there is no factual allegation concerning anything having to do with the

Petitioner in 'immigration.'

On December 8, 2004, McCarthy stated: "USCIS initiated this proceeding in

order to seek enforcement of the provisions that govern practice before this agency…"

(AR. 000486)

On January 26, 2005 McCarthy stated:

<u>USCIS</u> Exhibit 2: Copies of seven (7) "NOTICE OF ENTRY OF APPEARANCE

FORMS" (G-28) submitted by Respondent (here Petitioner) to USCIS...Exhibit 2 is

relevant to this proceeding as it establishes that Respondent (Petitioner) practiced before

USCIS." (AR 000315) (parenthesis supplied)

By contrast, footnote 3, however, abandons any pretense of supporting McCarthy

on this allegation. It cuts the cord between the Respondent parties before this Court, and

McCarthy, a senior level ethics attorney for the Board. The final cut comes at footnote 4

of the Respondents' Opposition. (R. 63) Here, as if to correct the Petitioner, the

Respondents find themselves making one final last ditch effort to avoid the facts in this

matter. In footnote 4, the Respondents are upset because, instead of saying that McCarthy

alleged that there were 111 forms G-28, the Petitioner stated that McCarthy had stated

that there were over 200. The Respondents then make one final attempt to prove a

negative by stating: "There were 111 forms, and samples were provided during

disciplinary proceedings." This statement was and remains unsupported. In fact, it is

nothing like the section quoted above. McCarthy herself never stated that the 7 forms

were a sample. Her language, as quoted above, is clear in that regard. There were seven

and only seven such pre-printed irrelevant forms. McCarthy has been given every

opportunity for nearly four years to rebut the horrific charge made by the Petitioner, that

her allegation is false. At any time, she could have, had they existed, placed the alleged

111 forms G-28 into the record. She never did it. With footnote 3 now abandoning the

notion that filling out a pre-printed form G-28 is somehow 'practicing,' the Respondents

before this Court can extricate themselves from culpability for McCarthy's false

allegation. Now that the Respondents admit that the forms do not constitute practicing, they do not have to reach the question of McCarthy's fraud upon the tribunal. The Respondents are signaling to this Court a way out of this matter.

Aside from pointing out the factual, legal and reversible language in the Judgment, the most vivid impact of footnote 3 is found when comparing it to McCarthy's statements and filings concerning her counterfeiting operation. Here the impact of footnote 3 is to allow the Respondent parties before this Court to separate themselves from McCarthy by declaring that the pre-printed forms do not constitute 'practicing.' There is no other manner in which the Respondents before this Court can extract themselves from being linked as counterfeiters.

Like the Barnes letter, now be proven to have been directly used to commit a fraud on the tribunal, so too, with McCarthy's counterfeit documents. Here the defense of McCarthy by the Respondent parties before this Court finally collapses with the publication of footnote 3. On January 26, 2005, McCarthy stated:

> USCIS Exhibit 3: Copies of documents from a case filed with USCIS (Attached). Exhibit 3 is relevant to this proceeding as it establishes that Respondent (Petitioner) practiced before USCIS after having been disbarred from the practice of law by the Supreme Court of Florida in 1997. (AR. 000315) (parenthesis supplied)

According to McCarthy, the documents in the exhibit are proof of some 'practicing.' They are, in fact, counterfeit documents that McCarthy created. McCarthy was worried that by just showing the pre-printed forms G-28, all seven, and the false

32

allegation that 111 had been filed, she would still not be able to make a showing of the Petitioner 'practicing.' She figured she would beef up her case with receipts from a fake immigration case.

In the process of beefing up her case, and possibly out of desperation, therefore, McCarthy decided to create a counterfeiting operation that was bungled form the beginning. The documents in support of her exhibit 3, the only documents used to support her theory, are counterfeit. (AR. 000384-000389) The Petitioner proved this fact below, and made that proof a part of his case before this Court (R. 1)  Like any counterfeiter, McCarthy was able to create a document which, at first glance, appears authentic. The counterfeiter's success depends on quick acceptance of the document, without question. Unfortunately for McCarthy, every single entry she used in creating the documents, is false (R. 1) She was able to get the 'tribunal' below to accept her counterfeiting operation because people and things below are very close. Barnes and McCarthy are both senior ethics lawyers. Their offices, although in different states, are both within the general immigration offices. They see the same Board members and administrative support staff every day. Everybody knows everybody so that there is a natural tendency for everybody to protect everybody. McCarthy counted on carrying that same effort into this Court, and she was successful, until the publication by her employers of footnote 3.

By rubber stamping the decision below, this Court states to everyone that the McCarthys of the world will always win. It's as if a person was arrested for bank robbery because that person went in to make a deposit at a bank. Later, the person is arrested and charged and the government appears with a bag full of money allegedly 'stolen' from the bank. The accused knows this to be false and sets out to prove, not only that he did not

rob the bank, but that the government's evidence consists of counterfeit bills printed by the prosecutor and used to charge the accused. Later, in court, the accused proves that the money is counterfeit, the judge still allows in the phony bills, but not the evidence that they are phony, and gets convicted. The accused then comes before this Court with that record, and this Court, wanting to protect the corruption visited upon the accused by the prosecutor and judge below, rubber stamps the trial court's conviction. That scenario seems impossible until the facts of the instant case are considered.

Now, take the facts of the instant case. McCarthy knows there are not 111 forms G-28. She knows she is making a false allegation. She also knows that the pre-printed forms, all seven, do not constitute 'practicing.' She knows this because she feels the need to beef up her proof. She searches everywhere for a single, substantive piece of paper filed by the Petitioner anywhere in immigration. Like Barnes, she comes up empty-handed. Unlike Barnes though, she knows that she has access to the print shop at immigration. She knows that the Ferriera case is pending out of Texas and believes that if she avoids letting anyone know that fact, she can create the documents as if they came out of Nebraska. She feels safe. Nobody will think to look in Texas. She then creates the counterfeit documents by lifting the names from pre-printed forms on the Ferreira case. She will not use the receipts in the actual Ferreira case because, again, those would be from the Texas office, and again, because the proof would be that the Respondent did nothing to constitute 'practicing.' She puts in bold on each counterfeit form "**Rejection Notice,**" to show that, not only was the Petitioner 'practicing' but that he was filing cases in an incorrect manner. (AR. 000384-000389) This would allow the 'tribunal' below to

34

conclude that the Petitioner was not only 'practicing' but also causing harm to the Ferreiras.

The one thing that McCarthy did not count on, however, was the Petitioner's knowledge of the Ferreira case, which had already suffered from problems with their attorney. As long as McCarthy believed that the Petitioner would panic and seek to end this matter immediately, McCarthy, like any counterfeiter, felt safe. She did not anticipate that the Petitioner would recognize the counterfeit documents. In addition, she clearly forgot to enter the fake case numbers in the database where anyone can now check on the status of any case online. This final mistake was fatal to her plan. She almost pulled it off, but forgot that one forensic detail. She could not cover her tracks because her employer's own database proves that the receipt numbers that she created are fake. (R. 1)

All of this is not re-treading what has already gone on in this matter. The point of this is that now, with the Respondents before this Court having provided the admission against interest in footnote 3, there is not only surprise, but newly discovered evidence to show that this Court should not merely rubber stamp the proceedings below. In footnote 3, the Respondents point to the hazard of such rubber stamping in this case. They know that the only pieces of alleged evidence in this matter, other than the pre-printed forms, are the McCarthy counterfeit documents. In addition, the Respondents before this Court know, because they too have surely conducted the analysis just shown that, if the only substantive evidence for this Court to rubber stamp, is in fact, counterfeit documents, then a very dangerous precedent would be set within their own offices. Put another way, if McCarthy's counterfeiting operation is rubber stamped by this Court, the Respondents before this Court know that they too will be subjected to proof that they condone

counterfeiting. In other words, the U.S. Department of Justice, The Executive Office for Immigration Review, and the Board of Immigration Appeals, including the ethics departments of those offices, approve of the government counterfeiting of documents to use a proof against an accused.

The Respondents before this Court, in footnote 3, are simply telling this Court that they are no longer prepared to offer that level of protection to McCarthy. Our institutions are simply too important.

**D.**

**THIS COURT SHOULD NOT RUBBER STAMP THE ORDERS BELOW, WHERE IT HAS BEEN SHOWN THAT ALL OF THE ORDERS, INCLUDING THE ONE FROM WHICH THIS APPEAL IS TAKEN, ARE BASED UPON THE FRAUD COMMITTED BY BARNES AND McCARTHY AND WHERE, NOW WITH THE RECENT PUBLICATION OF FOOTNOTE 3, THE RESPONDENTS REJECT THE FRAUD OF THEIR EMPLOYEES, BARNES AND McCARTHY**

The constant refrain of the Respondents before this Court is that there is only one Order appealed from, and therefore only one to consider. The Order appealed from, however, is essentially a composite of previous Orders. There is, in light of the error in the Judgment and also in light of footnote 3, therefore, no harm in reviewing all of the orders below.

The Respondents now admit, in footnote 3, that there was no 'practicing' of any kind involved in this matter. Without some 'practicing,' there is simply no case at any level, but particularly none as to the parties before this Court. Footnote 3, again, makes clear in its choice of words: "…the appearance forms indicate that he did appear before DHS…Those DHS appearances involved proceedings before USCIS ( a DHS component), which are not immigration court proceedings." Were there any dispute remaining on the part of the Respondents before this Court, footnote 3 would have alerted this Court that the appearance forms 'indicate that he did practice before DHS.' That is not what footnote 3 states, instead making clear that the appearance forms only "indicate that he did appear before DHS.' The difference is the first admission against interest by the Respondent parties before this Court, and completely rejects all of the McCarthy arguments concerning the Petitioner 'practicing' anything in any immigration forum.

The language of footnote 3 is therefore, not only dispositive on the question of vacating the Judgment in this matter, but also as to all other issues, whether pertaining to a party to this action or otherwise. The original order provides: "Therefore, the petition is granted, and the respondent (Petitioner) is hereby suspended from practicing before the Board, the Immigration Courts, and DHS…" (AR.000004) (parenthesis supplied) Footnote 3 admits that the Petitioner never 'practiced' anything in immigration.

A subsequent order erroneously also states: "The Respondent (Petitioner) clearly filed a number of "Notice of Entry of Appearance as Attorney or Representative" forms with the DHS in immigration proceedings, listing himself as "agent for petitioner and beneficiary." This constituted practice in the administrative immigration forum…" (R. 000245) (parenthesis supplied) Footnote 3 rejects this conclusion.

Finally, the Order appealed from states: "As we stated in our final decision in this case, the respondent (Petitioner) clearly "practiced" before DHS, by submitting numerous "Notice of Entry of Appearance As An Attorney or Representative" (G-28) forms to the DHS..." (R. 1)   Footnote 3 now, correctly, rejects this finding by the tribunal below as well.

**E.**

**THIS COURT SHOULD REJECT THE PREVIOUS FILINGS AND ARGUMENTS OF THE RESPONDENTS BEFORE THIS COURT BECAUSE, WITH THE RECENT FILING OF FOOTNOTE 3, THE RESPONDENTS HAVE CHANGED THEIR POSITION IN THIS MATTER TO A POSITION IN FAVOR OF THE PETITIONER**

The Respondents before this Court initially filed a motion to dismiss and to suspend further proceedings.  (R.1) They stated in the motion: "The Office of the General Counsel of the Executive Office of Immigration Review later joined the proceedings. On March 17, 2005, the immigration judge, serving as adjudication official under 8 C.F.R §1003.106, expelled Mr. Ramos from practice before the immigration courts, the Board and the DHS" (R. 1) The statement by the Respondents before this Court reflects the first effort to continue to promote the false posture of the facts as then already known below, and as now contradicted by footnote 3. The Respondents before this Court were aware

that the 'joinder' in the proceedings by EOIR and the Board had not been perfected, and could not have been perfected, given the Barnes letter referenced in footnote 3.

The Respondents before this Court then filed a MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A MANDATORY INJUNCTION AND PLAINTIFF'S FIRST SUPPLEMENT TO THE MANDATORY INJUNCTION MOTION AND IN SUPPORT OF DEFENDANT'S (Respondents') MOTION FOR SUMMARY JUDGMENT. (R. 15) (parenthesis supplied) They indicate, among other things:

    a) "Instead, he (Ramos) focused exclusively on the Board's jurisdiction to sanction him, arguing that he was not a member of an immigration bar. *See id.* The Board already had rejected plaintiff's (Ramos') jurisdictional arguments when granting the petition for immediate suspension...Accordingly, the immigration judge concluded that no hearing was necessary, and that expulsion was the proper remedy." (R. 15 p. 9) (parenthesis supplied)

    b) "The Board affirmed the immigration judge's expulsion of plaintiff (Ramos) from practice in a decision issued July 25, 2005 and amended (to make editorial changes) November 15, 2005." (R. 15 p. 9) (first parenthesis supplied)

    c) "The Board concluded that plaintiff's (Ramos') motion repeated arguments that the Board had already rejected, and failed to submit 'newly discovered evidence' that would warrant reopening the Board's prior decisions." (R.15. p. 9) (parenthesis supplied)

d)  "The Board denied plaintiff's (Ramos') motion to reopen because it found that the motion lacked merit. Plaintiff's motion accused the EOIR and DHS prosecutors of misrepresentation and making false statements concerning plaintiff's practice before the Board, immigration courts, or DHS, including the remarkable allegation that a prosecutor counterfeited the documents submitted as evidence that Ramos had been identified as applicants' attorney or representative in DHS proceedings…The Board reasoned that there were "no issues of material fact that would necessitate a hearing in this case, given that 8 C.F. R. § 1292.3 (c)(3) creates a rebuttable presumption that disciplinary sanctions should follow any final order of disbarment…

    The Board further held that "[t]he supposedly newly discovered evidence'" that plaintiff (Petitioner) referenced in his motion did not warrant reopening the case…Although that evidence included a letter from EOIR (the Barnes letter referenced by Respondents in footnote 3) indicating that plaintiff (Petitioner)  had not appeared as "attorney of record in *any cases before EOIR*, " Mr. Ramos had practiced before DHS, by submitting "Notice of Entry of Appearance As An Attorney or Representative'  forms to DHS on behalf of parties appearing before DHS… Accordingly, that evidence did not contradict the Board's prior holding that plaintiff was a "practitioner" subject to professional conduct rules governing practice before the Board, immigration courts, or DHS…" (R. 15 p. 15) (parenthesis supplied)

e)  "However that letter made no representations concerning plaintiff's (Petitioner's) practice before DHS. *See id.* Accordingly, it would not have

40

altered the Board's determination that plaintiff was a 'practitioner' subject to the disciplinary rules that govern practice before DHS, the Board, or immigration courts." (R. 15 p. 18) (parenthesis supplied)

Later, the Respondents before this Court filed their Reply in Support of Defendant's (Respondent's) Motion for Summary Judgment Summary of Argument. (R. 35) (parenthesis supplied) They state:

a) "However, the fact that Mr. Ferreira may have become a permanent resident sheds no light on whether Plaintiff submitted "Notice of Entry of Appearance AS Attorney or Representative" forms on behalf of Mr. Ferreira or other parties appearing before DHS….In any event, Plaintiff (Petitioner) already had accused the DHS prosecutor of falsifying documents, and the Board already had rejected that argument." (R. 35 p. 5) (parenthesis supplied)

b) The Respondents before this Court go on to make this remarkable statement: "However, the reciprocal disciplinary proceedings were initiated by DHS over a year and a half after the Barnes letter was sent, and DHS initiated those disciplinary proceedings based on Plaintiff's (Petitioner's) representation of individuals in DHS proceedings…EOIR joined the proceedings pursuant to regulations that allow EOIR to request that any order suspending a practitioner from practice before DHS also apply to the practitioner's ability to practice before the Board or the immigration courts…Those regulations do not condition EOIR's participation upon a practitioner's prior appearance in EOIR or Board proceedings." (R. 35 p. 5)

41

Case 1:06-cv-01941-RMU    Document 70    Filed 06/13/2008    Page 42 of 47

The Respondents then filed their Opposition to Plaintiff's Motion for Judgment on the Pleadings (R. 47) They state:

a) "The regulations plainly allow for discipline against <u>any</u> attorney who has been disbarred, suspended from practice, or otherwise engaged in unprofessional conduct. Further, even if the Board's disciplinary authority extended only to practitioners who have "practiced" before it, it would have the power to expel Mr. Ramos because he signed forms entering his appearance as "agent or representative" for numerous individuals involved in DHS proceedings." (R. 47 p. 2-3)

b) "In sum, the Barnes letter presents no new material evidence because Mr. Ramos's (sic) lack of participation in EOIR proceedings has no bearing on whether he could be disciplined or whether he participated in DHS immigration proceedings (parenthesis added)...

The G-28 forms in the record belie Mr. Ramos's (sic) claim that he never participated in immigration proceedings, as the Board properly concluded...

Signing forms designating oneself as the '"attorney or agent'" for an individual involved in DHS immigration proceedings is therefore '"practic[ing]'" before DHS... In any event, the regulations allow DHS and the Board to discipline '"any practitioner,'" regardless of whether the person has engaged in practice before the Board." (R. 47 p. 16)

c) "Finally, EOIR's participation in the case also was entirely consistent with applicable procedures and regulations. The regulations do not limit EOIR's

ability to participate in disciplinary proceedings commenced by USCIS. Instead they expressly authorize EOIR to request that any disciplinary sanctions that restrict the practitioner's ability to practice before DHS also apply to the practitioner's ability to practice before the Board or the immigration courts....There is nothing questionable about EOIR's decision to do so, notwithstanding Plaintiff's (Petitioners') unfounded speculation to the contrary." (R. 47 p. 20) (parenthesis supplied)

The Respondents then filed their Opposition to Plaintiff's Motion to Compel Production of Documents and to Supplement Administrative Record. (R. 49) They make the following remarkable an wholly unfounded statements:

a) "The fact of Mr. Ramos's (sic) enhanced disbarment was sufficient on its own to trigger the reciprocal discipline." (R. 49 p. 5)

b) "The regulations do not make reciprocal discipline contingent on an individual's prior participation in DHS, Board or immigration court proceedings (R. 49 p. 5)

c) "Thus, if Ramos's (sic) appearance in DHS proceedings were relevant to the Board's decision (and it is not), neither the Board nor this Court would need to review any additional G-28 forms to resolve that question." (R. 49 p. 6)

d) "Thus there is no basis on which to infer that bar counsel's failure to voluntarily produce those documents constituted bad faith. As explained above, the Board did not need those materials to evaluate the petition for reciprocal discipline or the jurisdictional defenses Ramos raised." (R. 49 p. 6)

43

e) "As noted above, there is no evidence of bad faith or improper behavior." ( R.

49 p. 7)

Finally, in their last filing before the publication of footnote 3, the Respondent

parties before this Court make this phenomenal statement:

> "The regulations do not make reciprocal discipline contingent on an individual's
> prior participation in DHS, Board or immigration court proceedings... Accordingly, the
> categories of documents that Ramos appears to believe would support his claim that he
> never practiced before DHS, the Board, or immigration courts, have no bearing on the
> Court's jurisdictional analysis." *See,* Opposition to Plaintiff's Motion to Compel
> Production of Documents and to Supplement Administrative Record (R. 48 pp. 5-6)

By stark contrast, then, this Court may now consider the language of footnote 3,

in its narrative form:

> Although Plaintiff (Petitioner) did not practice before the immigration courts, and
> had not practiced before EOIR as of January 17, 2003, the appearance forms indicate that
> he did appear before <u>DHS</u> <u>See</u> A.R. 0000774; Mem. Op. at 8. Those DHS appearances
> involved proceedings before USCIS (a DHS component), which are not immigration
> court proceedings. <u>But see</u> Mem. Op. at 2 (suggesting that Plaintiff (Petitioner) appeared
> before immigration courts). (parenthesis as to 'Petitioner' only added)

Despite every single protestation to the contrary, the Respondent parties before

this Court now make clear in footnote 3 that, in fact, reciprocal discipline is completely

contingent on and 'individual's prior participation in DHS, Board or immigration court

proceedings..." *See,* Respondents' quote above at R. 48 pp. 5-6.

Were it otherwise, for every single disciplinary case across the land, Barnes and

McCarthy would have to arise every morning, obtain the list of disciplined attorneys in

every state and Federal jurisdiction, and file disciplinary proceedings against them. There

has never been a case in the history of American jurisprudence where reciprocal

discipline was applied to someone who was not before the court which seeks the

reciprocal discipline. There is not even a regulation that provides that, even assuming the

Petitioner was before DHS, then EOIR, the Board and immigration courts, by magic,

obtained jurisdiction over him.


## V.

## AUTHORITIES IN SUPPORT OF AMENDED MOTION FOR

## RECONSIDERATION

The only controlling authority as to the Respondent parties before this Court is, 8 C.F.R.

§292.3 (c) (1), which provides:

> A copy of the petition shall be forwarded to the Office of the General Counsel of EOIR,
> which may submit a written request to the Board that entry of any order immediately
> suspending a practitioner before the Service also apply to the practitioner's authority to
> practice before the Board or the Immigration Courts.


## VI.

## CONCLUSION

The Judgment entered against the Petitioner is factually and legally fatally

incorrect, and therefore reversible, because there is no such thing as an 'immigration

court' in DHS.

In order for reciprocal discipline to apply, the person must have practiced before

Court seeking the reciprocal discipline.

The Petitioner never practiced before the Respondent parties to this matter.

Even assuming for the sake of argument only that DHS had jurisdiction over the

Petitioner, there is no statute, regulation, or case which allows for the Petitioner to

become vicariously liable to the Respondent parties before this Court absent a showing by those Respondents of the Petitioner actually practicing before them.

The Respondent parties before this Court acknowledge that the Petitioner was never before them.

The Respondent parties before this Court never had any jurisdiction over the Petitioner.

WHEREFORE, the Petitioner requests the entry of an Order granting his Amended Motion for Reconsideration, for a further Order vacating the Judgment in this matter, for a further Order granting the Petition with prejudice against the Respondent parties to this matter, and for a further Order awarding to the Petitioner such costs as may be taxable pursuant to the rules of this Court.

RESPECTFULLY SUBMITTED,

_____
Anthony E. Ramos, pro se
1805 Key Blvd.
Apt. 513
Arlington, VA
202-321-7969
tramos520@verizon.net

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 9th day of June, 2008, the original and two copies of the foregoing were filed with the clerk, and that two copies were mailed, via U.S. mail to: Robin M. Meriweather, Esquire, Assistant United States Attorney, 555 Fourth Street, NW, Washington, DC 20530
.

Anthony E. Ramos

47